**GLOBE & RUTGERS FIRE INS. CO. et al. v. UNITED STATES et al.**

**UNITED STATES et al. v. GLOBE & RUTGERS FIRE INS. CO. et al.**

**No. 186.**

Circuit Court of Appeals, Second Circuit. June 26, 1939.

Forrest E. Single, of New York City (Douglas D. Crystal and Wilbur H. Hecht, both of New York City, of counsel), for libellants-appellants-appellees and cross-respondents-appellees.

Lamar Hardy, U. S. Atty., of New York City (William E. Collins, of New York City, and Myron H. Avery, Paul D. Page, Jr., Bon Geaslin, Gen. Counsel, United States Maritime Commission, and J. Frank Staley, all of Washington, D. C., of counsel), for the United States.

Before SWAN and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge. It will facilitate the discussion of the respective rights of the parties to this appeal to consider first whether the cross-libellant is entitled to recover from the cargo underwriters any balance due in General Average. It is argued that the shipowner should recover General Average contribution because of an agreement made on November 24, 1920, to settle all controversies by a General Average adjustment. The agreement provided as follows:

"On fire and beached at Port of Spain, Trinidad. The cargo of coal has been badly wetted in extinguishing the fire, the water having reached a height of 28 ft. in the hold and as it is deemed dangerous and inadvisable to reship coal because of the most certain probability of its firing on account of having been badly wet, it is proposed to sell same at Trinidad if possible, loss to be made good in General Average.

"The United States Shipping Board, owners of the vessel, have concurred in the above, in so far as the vessel is concerned.

"We, the undersigned interested Underwriters on cargo, assent to the foregoing arrangement in so far as interested."

The foregoing document was signed by the underwriters but it is to be noticed that they assented to the arrangement only "in so far as interested". These words may be regarded as reserving both the question whether the owner of the vessel possessed the right to enforce a settlement in General Average and also the question whether the amount stated by the adjusters as due from the cargo was correctly computed. But even if the words were insufficient to reserve the right to contest liability in General Average, the circumstances under which the assent was given seem to negative any intent to settle all disputes by that method and to abandon all defenses. As the court below held, the apparent purpose of the contract of November 24, 1920, was to "provide for the prompt sale of the coal in Trinidad so as to avoid further loss from deterioration and carrying charges." The owner never signed the document and so far as appears never claimed a right to recover in General Average until years after the statement showing a balance due to it was issued. Moreover, an arrangement for procuring the submission of a statement in General Average, or even the giving of a bond to secure payment of a contribution due in General Average, does not normally prevent questioning either the existence or the amount of a General Average obligation. McAndrews v. Thatcher, 3 Wall. 347, 18 L.Ed. 155; Wellman v. Morse, 1 Cir., 76 F. 573, 581; The L'Amerique, D.C., 35 F. 835, 848; Lowndes, General Average, 5th Ed., Appendix V by W. R. Coe, p. 718, at 776.

It follows from the above that the agreement of November 24, 1920, furnishes no ground for a recovery by the shipowner of a general average contribution from the cargo owners.

It is contended, however, that recovery in General Average may be had under the "Jason" clause in Article 11 of the contract of affreightment because the shipowner had exercised due diligence to make its vessel in all respects seaworthy. But the owner of the vessel had the burden of proving such due diligence, May v. Hamburg, etc., 290 U.S. 333, 54 S.Ct. 162, 78 L. Ed. 348; The Wildcroft, 201 U.S. 378, 26 S.Ct. 467, 50 L.Ed. 794, and the district judge held, for reasons that appear to us sufficient, that it had failed in its proof.

The Zaca sailed from Norfolk on October 1, 1920. During the next two weeks the vessel experienced recurrent breakdowns even though the weather was clear. Shortly after leaving Norfolk one generator burned out and the testimony shows frequent trouble with the electrical equipment. Thus, on October 2nd all the electric running lights went out for half an hour; likewise, on October 6th, the dynamo again failed to work and refrigeration ceased. This condition still existed on October 7th so that oil lamps had to be used. On October 9th she arrived at St. Thomas to take on oil, but secured none. She remained there twenty-four hours, sailing thence for Point Au Pierre and then for Port of Spain, Trinidad. On October 11th the dynamo remained out of order and there was no refrigeration. At Port of Spain both dynamos were in very bad condition and were taken ashore for repairs; one was in such shape that it could not be repaired there. There was testimony that the location of the generators was on a flat in the engine-room in a hot part of the ship and that this may have been the cause of the short circuiting and burning out of the generators. Considerable trouble with the generators had been experienced on previous voyages.

Between Norfolk and St. Thomas the vessel experienced priming of the boilers, probably due to a leaking condenser. The evidence indicates that the boilers were priming continuously.

The testimony also shows that on October 2, 3, 5 and 6 the steering gear of the Zaca was out of order. Captain Griffin, at an inquiry before the British Vice-Consul at Port of Spain, testified:

"On the voyage from Norfolk to St. Thomas we twice had machinery trouble.

The dynamo broke down and we had priming of boilers due to a leaking condenser."

\* \* \* \* \* \*

"I remained at Port of Spain in consequence of repairs being necessary to boiler tubes, condenser tubes, dynamo, machine, feed pumps and fuel pumps, etc. and cylinder heads, springs, etc."

The Zaca also suffered constant breakdowns on her prior voyage. After leaving Hamburg in June she had to stop on account of boiler trouble and to be towed to New York by the Pocahasset for a distance of about 1,000 miles. On the trip from New York to Norfolk she had steering gear trouble, her boilers primed, and she was towed into port. On August 29th the Zaca sailed from Norfolk for New York, after specified repairs had been completed, but failed to get out of the harbor.

The respondents attempt to meet this evidence of unseaworthiness by offering proof of the following repairs and tests made at Norfolk:

When the Zaca broke down in the harbor at Norfolk it was thought to be unsafe to proceed further without repairs. Accordingly, an attempt was made to cure priming by relocating the dry pipes and steam lines of the boilers. Likewise the condenser, the leakage of which had contributed to the priming on the last voyage, was tested and made tight. There was evidence that after these repairs were completed a test was made which showed that the priming had ceased.

Proof was also offered that the steering gear was overhauled, tested, and found to be in good working order. In August the generators were repaired and tested by running them for three hours under full load. Repairs were also made to them in September.

In view of the frequent breakdowns during clear weather we cannot say that the finding by the trial court of lack of due diligence was not justified. Taking the evidence in the aspect most favorable to the shipowner there was at least justification for a doubt in the mind of the judge as to the adequacy of proof of due diligence. The Southwark, 191 U.S. 1, 24 S. Ct. 1, 48 L.Ed. 65; International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830; Benner Line v. Pendleton, 2 Cir., 217 F. 497, 504, 505, affirmed on other grounds, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770; Compagnie

Maritime Francaise v. Meyer, 9 Cir., 248 F. 881. The equipment of the Zaca did not become disabled during a storm as in the case of The Floridian, 2 Cir., 83 F.2d 949. Consequently the court was justified in ascribing the breakdowns to defects existing at the commencement of the voyage. Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012.

■ The shipowner presents a further ground for claiming General Average based upon the rule laid down by the House of Lords in Louis Dreyfus & Co. v. Tempus Shipping Co., 1931, A.C. 726. It was there held that a shipowner might recover in General Average where a loss was occasioned by a fire which happened without the fault or privity of the owner despite the fact that the fire was caused by the unseaworthiness of the vessel. This was because the British Fire Statute expressly exempted the "owner of a British seagoing ship" from liability for damage to the cargo by reason of fire on board the ship where the loss happened "without his actual fault or privity". The reason for the decision was given by Lord Atkin:

"If by convention between the parties the so-called fault is an act which is not actionable as between them, the foundation for the doctrine invoked disappears. It is no longer a wrong of the shipowner which has caused the peril: it is no longer inequitable for him to enforce a contribution. \* \* \* That the act or omission is made by statute not actionable rather than by agreement can hardly be a circumstance affecting the ultimate liability. By the most effective method it is prescribed that in cases falling within the statute there is no actionable fault. If so the right to contribution is not destroyed."

The distinction between the English decisions and that of the United States Supreme Court in The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130, was expressly mentioned by Lord Atkin in Louis Dreyfus & Co. v. Tempus Shipping Co., supra. In The Irrawaddy it was held that though the owner had exercised due diligence to make his vessel seaworthy the only effect of the Harter Act (46 U.S.C.A. § 190 et seq.) was to relieve him from responsibility for damages to cargo resulting from faults or errors in navigation or management of the vessel and that the statute did not enable him to claim contributions to General Average expenditures necessitated by negligent navigation. Compare The

Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969, allowing claim to such contributions where based on contract. It is evident from the above that mere exemption from liability under our Fire Statute, which we shall deal with later, would not have the effect attributed by the House of Lords to exemption under the British Fire Statute. Spang Chalfant & Co. v. Dimon S. S. Corp., 2 Cir., 57 F.2d 965; Societa Anonima Cantiero Olivo v. Federal Ins. Co., 2 Cir., 62 F.2d 769, 772, certiorari denied, 289 U.S. 759, 53 S.Ct. 792, 77 L.Ed. 1503.

█ The terms of the contract of affreightment in the case at bar made recovery of General Average conditional upon the exercise by the owner of due diligence to make the vessel in all respects seaworthy, and imposed that condition upon any recovery whether the loss resulted "from accident or from default or error in navigation or in the management of the vessel or from any latent or other defect in the vessel, or machinery and appurtenances, or from unseaworthiness, * * *." The contract between the parties covered the loss that occurred here and precluded recovery of General Average where due diligence was not exercised. The York-Antwerp Rules of 1890, referred to in the same clause, do not purport to control the obligation to contribute. Societa Anonima Cantiero Olivo v. Federal Ins. Co., 2 Cir., 62 F.2d 769, at page 773.

█ The foregoing reasoning disposes of the cross-libel of the United States which was properly dismissed, but the dismissal must be without costs, which were improperly awarded ⁰against the government. United States v. Worley, 281 U.S. 339, 344, 50 S.Ct. 291, 74 L.Ed. 887; United States v. Chemical Foundation, 272 U.S. 1, 20, 47 S.Ct. 1, 71 L.Ed. 131; The Glymont, 2 Cir., 66 F.2d 617.

█ We now come to a consideration of the libel filed by the underwriters. As subrogees they assert the cause of action of the Virginia Coaling Corporation, the owner of about 7,000 tons of coal laden on the Zaca for a voyage from Hampton Roads, Virginia, to LaPlata or Buenos Aires, South America. The vessel sailed with her cargo on October 1, 1920, and arrived at Port of Spain, Trinidad, on October 13th to have necessary repairs made to her equipment. On October 18th an explosion in her engine-room because of the bursting of a fuel oil feed line set fire to the vessel and made it necessary to beach her in order to extinguish the fire. This operation resulted in the inundation of the coal which was salvaged and sold at Trinidad, by agreement of all parties, at a loss to the shipper.

As a defense to the recovery of this loss by the underwriters as subrogees of the shipper the owner of the vessel pleaded the Fire Statute. Rev.Stat. § 4282, Act of March 3, 1851, c. 43, § 1, 9 Stat. 635, 46 U.S.C.A. § 182. The underwriters argue that the Fire Statute afforded no defense to the libel because the fire was "caused by the design or neglect of * * * (the) owner". It is said that the neglect consisted of the failure of the shipowner to provide the fuel oil lines of the vessel with extension shut-off valves which would be accessible in the event of a fire in the boiler-room. The extensions to the shut-off valves for the low suction lines, which the judge found were in use at the time of the fire, were located on the fiddley top alongside an exit from which men working in the engine-room might escape to the deck in case of fire. It is claimed that this exit formed a huge vent up through which flames from the fire-room would shoot and that therefore, as a practical matter, the extensions would not be accessible either from the exit or from any part of the deck in case there was fire in the rooms below.

The trial judge found that the location of these extensions was determined by Joslyn, a competent engineer and shipbuilder, and that they were installed in the position they occupied in order to place them where anyone who had to use the emergency exit from the fire-room would be likely to go. A ladder from the fire-room led to the emergency exit to the fiddley, so that a man using it would be in close proximity to the extension rods. The engineer who located the rods might well have thought that there ordinarily would be sufficient time to ascend from the engine-room or approach the extension wheels from the deck before the flames from below would render this impossible; and considerable time apparently did elapse before any attempt was made to reach the extension wheels from the deck. Joslyn testified that the arrangement of the extension rods was good marine practice on the Pacific Coast, where the vessel was built, and was in accordance with the prevailing requirements of the Classification

Societies and Steamboat Inspection Service. There was also testimony by surveyors of the American Bureau of Shipping and of Lloyds that the arrangement was approved ship construction. Likewise Paul A. Hansen, chief draughtsman for the New York Shipbuilding Company since 1917, and acting chief engineer since 1921, concurred in these views. The Zaca had been built by a large shipbuilding concern which had constructed thirty-five other vessels having a similar arrangement of fuel oil cut-offs, and the plans, including that for the fuel oil system, had been approved by Lloyds and by the United States Steamboat Inspection Service which granted her a permit to use fuel oil after inspecting her fuel oil equipment. On the other hand, witnesses of wide experience called by the underwriters condemned the location of the extension rods on the ground that they were inaccessible in the event of fire. Thus there was a conflict in the testimony as to whether the extension rods were located in a proper place. Judge Goddard, who tried the case, found that the underwriters had not met the burden of showing that the fire or its spreading was the result of the design or neglect of the owner. The Salvore, 2 Cir., 60 F.2d 683, certiorari denied United States Steel Products Co. v. Navigazione etc., 287 U.S. 653, 53 S.Ct. 117, 77 L.Ed. 565. He reached this conclusion because the location of the extension rods had been generally approved by competent engineers and surveyors, see The Older, 2 Cir., 65 F.2d 359, and there had been no suggestion from which the owner might reasonably infer that it was not proper. Compare Angliss & Co. v. P. & O. Steam Nav. Co., 17 Aspinwall Maritime Cas. 311 (1927). He had ample ground for finding that the owner was not subject to liability for the reason that the fire was not caused by its design or neglect. We accordingly affirm his ruling that the Fire Statute was a good defense.

■ The contention of the underwriters that the owner could not invoke the Fire Statute because of a warranty of seaworthiness in the contract of affreightment is unsound and is in direct conflict with the decision of the Supreme Court in Earle & Stoddart v. Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403. The contract of affreightment shows no evidence of an intent to relinquish the benefits of the statute. The Ida, 2 Cir., 75 F.2d 278.

■ The contention is also made that there was a deviation by the Zaca because of an unreasonable delay in sailing from Norfolk and a departure from the usual course in calling at St. Thomas, whereby the shipowner lost the benefit of the Fire Statute. A causal connection between the deviation, if any, and the fire was not established and accordingly the argument is negatived by our decision in The Ida, 2 Cir., 75 F.2d 278. See Earle & Stoddart v. Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403.

■ The last matter for consideration is whether the shipowner is entitled to retain the prepaid freight by reason of the express terms of the contract of affreightment. The contract provided for the carriage of the cargo to LaPlata or Buenos Aires and stated that the freight of $11.50 per ton was "payable at New York in cash or its equivalent, free of discount or interest, within twenty-four (24) hours after notice of signing bills of lading at loading port, but not before presentation of the original bill of lading in triplicate at the office of the party of the first part at New York, and so payable and/or not returnable, ship lost or not lost, cargo delivered or not delivered." The full freight, as thus computed, amounted to $86,025.75. Judge Goddard held that, as the voyage was abandoned at Port of Spain and the coal sold there by mutual consent, the vessel owner was only entitled to the freight "pro rata itineris peracti" that might have been earned in carrying the coal to that point and was not entitled to full freight to Buenos Aires. He accordingly allowed a recovery of prepaid freight in the amount of $59,617.40 and interest.

In Standard Varnish Works. v. The "Bris", 248 U.S. 392, 39 S.Ct. 150, 151, 63 L.Ed. 321, there was a provision in a bill of lading that "prepaid freight is to be considered as earned on shipment of the goods and is to be retained by the vessel's owners, vessel or cargo lost or not lost, or if there be a forced interruption or abandonment of the voyage at a port of distress or elsewhere." After the shipment of the cargo a proclamation was made by the President which required the shipper to procure an export license. Unless such license was procured the men-of-war belonging to the allies would not allow the shipments to proceed to destination. The license was not secured, and the shipper took redelivery of the cargo at the port of

shipment. The Supreme Court held that the prepaid freight clause was controlling and precluded the shipper from recovering any part of the prepaid freight. See also Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15, and International Paper Co. v. The Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318. It has also been held that even in the case of an involuntary deviation or a breach of warranty of seaworthiness the shipowner may rely upon the clauses of the contract to retain prepaid freight. The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L. Ed. 901.

We think that the foregoing decisions show how strictly and literally prepaid freight clauses have been construed by the Supreme Court. The facts of each afforded a much stronger claim for the return of freight than those here. The prolongation of the voyage beyond Port of Spain, where the wetting of the coal had increased the hazard of spontaneous combustion, would have been highly dangerous to both ship and cargo. While the shipowner in the course of negotiations offered to carry the coal to its destination the underwriters demanded return of the freight as a condition for agreeing to sell the coal at Trinidad. This was refused by the shipowner and the agreement to sell the coal at Trinidad was finally acceded to by the underwriters upon the express stipulation that insistence upon a refunding of the freight was waived. While this waiver may not have been intended to preclude the underwriters from exercising any rights they had to recover prepaid freight, it certainly indicates that when, for the advantage of all parties, the arrangement was made to sell the coal at Port of Spain, no one understood that the prepaid freight provision in the contract was to be rescinded. At that time the only matter in contemplation was a salvage operation at the port where the fire occurred. We hold, under these circumstances, that no part of the freight is recoverable.

█ It only remains to determine whether there was a voluntary deviation which would annul the contract of affreightment, S. S. Willdomino v. Citro Chemical Co., 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491; The Malcolm Baxter, Jr., 277 U.S. 323, 332, 333, 48 S.Ct. 516, 72 L.Ed. 901, and hence permit recovery of the freight by the cargo owners.

Judge Goddard found on evidence which seems convincing that the delay at Norfolk was with the implied approval of the shipper and that the call at St. Thomas was likewise made with its approval. The Barber Steamship Lines, which operated the Zaca under contract with the Shipping Board, and the cargo owner, Virginia Coaling Corporation, had identical ownership and a number of common officers. A single officer, Mr. Wigg, apparently controlled the loading, the repairs and the itinerary of the Zaca. In such circumstances we cannot say that there was any voluntary deviation.

The decree in so far as it allows recovery by the libellants of prepaid freight is reversed and the libel is dismissed, but without costs. The decree in so far as it dismisses the cross libel by the United States with costs is modified so as to eliminate costs against the latter, and as so modified is affirmed.

NOTE: MANTON, Circuit Judge, sat at the argument of this appeal but resigned before the opinion was written.