The EASTERN MARINE & FIRE IN-SURANCE COMPANY, Plaintiff,

v.

S. S. COLUMBIA, her engines, boilers, etc., et al., Defendants.

OGDEN SEA TRANSPORT, INC., as successor to Sea Transport, Inc., Third-Party Plaintiff,

v.

John Pemberton MOSSE, an Underwriter at Lloyd's, and Indemnity Marine Assurance Co., Ltd., Third-Party Defendants.

No. 68 Civ. 4798.

United States District Court, S. D. New York.

Feb. 26, 1976.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiff and third-party defendants by Alan S. Loesberg, Richard H. Webber, New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for defendants and third-party plaintiffs by Joseph C. Smith, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

The ship's rudder fell off in the middle of the Indian Ocean.

This occurrence happened under conditions to be expected in that place at that time of the year. (These conditions will be more specifically set forth hereinafter.)

The owner declared a general average.

The plaintiff, Eastern Marine and Fire Insurance Company (hereinafter referred to as "Eastern") seeks to recover from the owners and operators of the S.S. COLUMBIA the sum of $120,000 which Eastern deposited as security for the general average claim arising out of this occurrence in August 1966. In turn, Ogden Sea Transport, Inc. (hereinafter "Ogden") seeks recovery of $47,200.86 from the plaintiff Eastern and the third-party defendants Corporation of Lloyd's (hereinafter referred to as "Lloyd's") for the unpaid portion of the general average expenses.

At the time in question, the S.S. COLUMBIA was carrying a cargo of superphosphate from Safi, Morocco, to Korea. It is the position of the plaintiff that the S.S. COLUMBIA was unseaworthy with respect to her cargo at the time of sailing from Safi, Morocco, and that the defendants had failed to exercise due diligence to make the ship seaworthy prior to such sailing. The defendants of course dispute the foregoing and claim that the loss of the rudder was caused by the ship encountering heavy seas and thus that the cargo owners are liable for their portion of the general average.

The S.S. COLUMBIA is a bulk carrier, having been converted from a T–2 tanker in 1962 by the insertion of a new midbody. On October 4, 1963, the COLUMBIA grounded while lying aside a pier at the port of Kandla, India, and, apparently, the vessel's rudder assembly suffered damage. The damage was repaired between March 25 and April 4, 1964, when the ship was drydocked in Norfolk, Virginia. At that time the rudder palm was disconnected and the top and bottom rudder pintles were removed. The rudder was also removed to the shipyard's shop for further examination and repairs. The rudder stock was removed from the vessel as well and taken to the shop where it was examined and checked, together with the rudder for alignment. At that time the top pintle was found to be fractured and was renewed, including a bronze liner. A fracture in the rudder plating was v-ed out and rewelded, after which the rudder was tested and found tight. A new skeg was installed and modifications were made to it with the approval of the American Bureau of Shipping, and a surveyor for the Salvage Association of London. Apparently the repairs were made to the satisfaction of the vessel's Master, the owner's marine surveyor and

the various inspectors and other surveyors.

The COLUMBIA was operated until the following March 1965, when she was again drydocked, this time at Jacksonville, Florida. According to a report to the American Bureau of Shipping, dated March 25, 1965, certain repairs were made to the rudder and the rudder assembly, including the removal of the lower pintle "to shop" and its subsequent reinstallation. Apparently the nut holding the lower pintle in place was found to be loose and afterwards the pintle was reinstalled and the nuts on the lower and upper pintles were hardened up. Nut-keepers were installed on both nuts and a flat bar installed on the lower edge of the pintle in the skeg to prevent the pintle from dropping down if the pintle nut became loose.

After the completion of the repairs at Jacksonville in 1965, the vessel retained the highest ABS classification. On April 29, 1966, Sunda Marine, Inc. and the Office of Supply, Government of the Republic of Korea, entered into a charter for the carriage of 20,000 metric tons of superphosphate in bulk from Safi, Morocco, to a port in South Korea. It was this shipment that came to be insured by the plaintiff.

On or about July 15, 1966, the COLUMBIA arrived at Safi, Morocco, and her master and chief engineer made inspections of the visible hull, rudder and propeller when the ship was unladen, at which time nothing unusual was found.

On or about July 18, 1966, the COLUMBIA, laden with the superphosphate, sailed from Morocco and made her way through the Atlantic Ocean, Mediterranean Sea, the Suez Canal and the Red Sea to the Indian Ocean. There, on August 2, 1966, the COLUMBIA encountered the monsoon winds which begin in mid-June and have been known to be generally heavy from then to the end of July or early August, after which the winds generally moderate. The log for the COLUMBIA shows that on August 2, 1966 the ship encountered winds of force 7 on a Beaufort scale; the same force was encountered on August 3rd until about noon when the winds and seas abated to force 6–7 by the time, 1635 in the afternoon, that the rudder was lost.

The ship was thereafter towed to Ceylon and subsequently to Singapore for repairs.

There was no evidence of any grounding or the striking of a submerged object or bank or the like, to cause the loss of the rudder. The deck logs and the engine logs contain no reference to an incident that might have been relevant to the loss.

At Singapore, a diver's inspection found that the rudder was fractured at approximately two inches below the palm flange. The upper pintle was still in place although the pintle nut was missing and the pintle threads damaged. The lower pintle and pintle nut were missing although the bushing in the skeg apparently was in place. The skeg was undamaged.

All parties agree that United States law applies, and particularly the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 *et seq.*

■ Was the ship unseaworthy? I must conclude that she was. The fact that the ship's rudder fell off on a voyage while not encountering abnormal seas for the voyage and without any other apparent outside cause compels the conclusion that in fact and in law the ship was unseaworthy. *Great American Insurance Company v. Bureau Veritas*, 338 F.Supp. 999 (S.D.N.Y.1972), aff'd, 478 F.2d 235 (2d Cir. 1973).

". . . where a vessel is lost under ordinary conditions with no other explanation, the law presumes that she was unseaworthy. *Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores, S.A.*, 388 F.2d 434, 436 (2d Cir.) *cert. denied* 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968); *South, Inc. v. Moran Towing & Transportation Co.*, 360 F.2d 1002, 1005 (2d Cir., 1966)." *Great American, supra,* at 1008.

This, however, does not end our inquiry. The Carriage of Goods by Sea Act expressly provides in part (46 U.S.C. § 1303(1)):

"The carrier shall be bound, before and at the beginning of the voyage, *to exercise due diligence to—*"

(a) Make the ship seaworthy; * * (emphasis supplied).

The same principle is found in the following section stated as an immunity (46 U.S.C. § 1304(1)):

"Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness *unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, * * *"* (emphasis supplied).

Two questions are, thus, presented for determination by this Court: (1) did the owner exercise due diligence to see that the vessel was seaworthy? and (2) who has the burden of proof on the question of due diligence?

Turning to the second question first, it seems to me clear that the vessel and the carrier have the burden of proof to show "due diligence". The grant of "immunity" in Section 1304 of Title 46 U.S.C. is such as to place the burden of proof on the person claiming it. Indeed, any other construction would fly in the face of reality for the owner of a vessel is in the unique position to know what, if any, repairs had been made to the ship to make her seaworthy prior to the voyage. See *Encyclopedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 16 (2d Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). See also *DuPont de Nemours International, S.A. v. S.S. Mormacvega*, 493 F.2d 97, 100 at n.7 (2d Cir. 1974); H.R.Rep. No.2218, 74th Cong., 2d Sess. 8–9 (1936).

The burden falls thus on the owner, here the defendant, to prove its "due diligence". I find that it has met that burden.

When the rudder assembly was first damaged in India in 1963, repairs were made fairly promptly under the supervision of independent marine surveyors, all of whom apparently passed favorably on the workmanship of the repairs and the ship was restored to the highest classification of the American Bureau of Ships. Subsequently, the COLUMBIA was again put in drydock and inspected. Keeper bars were installed over the pintle nuts. Again independent marine surveyors and inspectors found the work to be satisfactory and the ship seaworthy.

The captain and the chief engineer visually inspected the rudder and other parts of the ship while it was light at the dock in Safi immediately prior to the voyage in question.

What more could be done? It is not necessary that a ship be drydocked prior to every voyage. Nor is it required that the rudder and the other metal parts be X–Rayed to determine possible metal fatigue.

I hold, therefore, that the defendant has met its burden of proof on the facts in this case and did exercise due diligence within the meaning of §§ 1303 and 1304 of Title 46 U.S.C.

Settle order on notice.