ATLANTIC RICHFIELD COMPANY,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant,

Commodity Credit Corporation,
Defendant.

No. 79–2796.

United States Court of Appeals,
Fifth Circuit.
Unit A

March 27, 1981.

Douglas N. Letter, William Kanter, Appellate Staff, Civil Div., U. S. Dept. of Justice, Washington, D.C., for defendant-appellant.

Baker & Botts, Randy J. McClanahan, Houston, Tex., for plaintiff-appellee.

Before AINSWORTH, CHARLES CLARK and WILLIAMS, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The United States appeals from a judgment holding it liable under the general average doctrine for a portion of the expense of repairing a ship that was carrying its cargo. We affirm.

The United States, in January 1973, acting through the Commodity Credit Corporation, contracted with the Atlantic Richfield Company (ARCO) to ship 1.7 million bushels of wheat to Bangladesh on the SS ATLANTIC HERITAGE. In the process of changing loading berths, the ATLANTIC HERITAGE made a turn in the Corpus Christi ship channel turning basin. During this maneuver, a duty engineer felt a jolt on the port

side of the engine room and noted this in the engineer's log. This entry was not brought to the Captain's attention but was put into the engineer's smooth log in red. The event was not otherwise noticed or noted. The ATLANTIC HERITAGE reberthed and completed its loading without incident.

On March 11, 1973, the ATLANTIC HERITAGE set out from Corpus Christi. After refueling in the Netherlands Antilles, the ship headed for Bangladesh. Except for this one-day refueling stop, the vessel sailed at full speed for two weeks, without incident. On March 25, while in calm seas and good weather, the vessel lurched, lost half of its engine's revolutions per minute, and developed difficulty in steering. An investigation by the crew revealed damage to the ship's propeller: two blades were bent, and one blade had sheared off completely. At reduced speed the ship proceeded directly to the nearest port, Cape Town South Africa, for repairs. The vessel was dry docked while fully loaded and repaired at a cost of nearly $70,000. The voyage was then completed.

ARCO demanded a share of this repair expense from the United States as owner of the cargo, under the admiralty doctrine of general average. The district court awarded judgment to ARCO in the amount of $31,029.66.

The United States makes two arguments on this appeal. The first is that the ATLANTIC HERITAGE was unseaworthy at the beginning of its voyage and thus was not entitled to recover from the cargo owner under the general average doctrine. In making this argument the Government asserts that, because failure occurred without explanation, a presumption of unseaworthiness at the time of departure should apply and that, even without the presumption, the facts demonstrate the vessel was unseaworthy when it departed Corpus Christi. The second argument is that ARCO failed to meet its burden of proving that it exercised due diligence to make the ship seaworthy prior to sailing.

The law to be applied to this case is drawn from four sources: the maritime doctrine of general average, the York-Antwerp Rules, the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300–1315, and the agreement between ARCO and the United States evidenced by the Charter Party and bills of lading. General average is an ancient maritime doctrine making all participants in a maritime venture ratably responsible for losses incurred for their common good.[1] The York-Antwerp Rules were adopted by an international conference and have no independent force,[2] yet they are incorporated into most shipping agreements. The 1950 version of the York-Antwerp Rules was incorporated by reference in the Charter Party and the bills of lading relevant here. COGSA gives effect, subject to its provisions, to agreements for the carriage of goods by sea to or from any United States port. The Charter Party and the bills of lading expressly incorporated COGSA. The Charter Party contained a "Jason Clause," named for the case holding such clauses enforceable,[3] which provides for general average contribution even where the carrier is negligent, unless the carrier is responsible for the damage under COGSA. COGSA holds the carrier (or ship) at fault for damage to the cargo caused by unseaworthiness only if a "want of due diligence on the part of the carrier to make the ship seaworthy" is shown. 46 U.S.C. § 1304(1).

■ The parties agree upon the effect of these various sources of law on this case, at least to this extent: where a general average situation exists, the shipowner can recover a contribution from the cargo owner unless the ship owner would be liable to the cargo owner under COGSA in a cargo damage case. This partial agreement permits

---

1. *See generally Orient Mid-East Lines, Inc. v. A Shipment of Rice*, 496 F.2d 1032 (5th Cir. 1974).

2. The Rules were originally adopted in 1890, and have been amended by new rules in 1924,
1950, and 1974. *See generally* Gilmore and Black, Law of Admiralty, § 5–5.

3. *The Jason*, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed.2d 969 (1912).

an analysis of the present appeal in the form of three questions. Was there a general average loss or expense? If such a loss or expense occurred, was the ship seaworthy when it left port? If the ship was unseaworthy, did the ship owner exercise due diligence in attempting to make the vessel seaworthy?

■ The parties agree that in this case, the first question must be answered affirmatively. We therefore move to the second. This circuit recognizes a presumption of unseaworthiness at the time of departure when a ship breaks down shortly after departure in clear weather and calm seas. *Ionian Steamship Co. v. United Distillers*, 236 F.2d 78, 80 (5th Cir. 1956). The district court's failure to apply the presumption in this case was not error. To begin with, the Government's attorney did not adequately request application of the presumption in the trial court. The record discloses only these obtuse remarks on the subject by Government counsel in her opening statement:

> We are not here necessarily to prove what incidents caused the unseaworthiness, but we are presenting to the court that a propeller was lost on the high seas and that is somewhat of a preponderance, a good deal of evidence to show that something was wrong with the vessel to lose a propeller on the high seas when there is no logging at all that an object was struck, or the ship grounded on high seas, or anything of that nature.

Explicit articulation of the desire to invoke a presumption, while certainly the best, is not the only way to make the point. However, merely describing the expected proof as indicating "somewhat of a preponderance" or "a good deal of evidence" does not suffice to put the trial court in error for failure to apply the presumption.

Even assuming application of the presumption had been properly requested in the district court, that court would not have been in error in refusing to apply it to these facts. As soon as the defect in the propeller blades became known, the ship was unable to make full revolutions. Before the March 25 incident, the vessel had steamed uneventfully for two weeks at full speed. This period of regular operation makes it highly unlikely that the propeller had been damaged from the start of the voyage. The district court would have been entitled to believe, under the evidence in this case, that application of a presumption of unseaworthiness at the time of departure from Corpus Christi was not warranted.

■ The burden of proving the affirmative defense of unseaworthiness at the start of a voyage is properly placed on the cargo owner. Most maritime misadventures which qualify as general average situations have an obvious cause. The presumption would apply to unexplained failures that indicate a defect existed at the time of departure. Thus it relieves the cargo owner from a difficult or impossible burden of proof problem in all but those cases where the time and cause of failure, as here, are unknown and unknowable by any reasonable deduction.

The uneventful passage of fourteen ordinary steaming days at sea, some in heavy weather, without incident, make it mechanically unreasonable to assume something was wrong with the ATLANTIC HERITAGE when she left port. The Government's own witness testified that most instances of propeller damage result from striking something in the water. While this expert thought the incident in the turning basin could have cracked the blade that sheared off at sea, no one advanced the theory that such a latent defect could have caused the other two blades to bend after fourteen days of normal operation at sea. This is simply too long a record of seaworthy operation to be overcome by the discovery of one man's record of an otherwise undetected bump or jolt during a properly executed maneuver in a designated turning basin. We decline to fault the district court for not requiring ARCO to rebut some unknown effect of the turning basin incident.

■ Next the Government argues that the ATLANTIC HERITAGE was in fact unseaworthy when it left Corpus Christi.

Even here the Government erroneously assumes that the burden of proof was on the ship to prove its seaworthiness. It directs our attention to no facts tending to prove unseaworthiness. The only evidence presented to the district court which might suggest some unseaworthiness of the vessel concerned the jolt on the port side of the engine room felt and recorded by the duty engineer. As stated, no one knows what caused the jolt or whether any part of the ship was damaged by whatever caused it. Given this meager evidence, the district court was correct in concluding that the government had failed to meet its burden of proving the ship unseaworthy. This affirmative answer to the second question makes it unnecessary to answer the third.[4]

The judgment of the district court is AFFIRMED.

AINSWORTH, Circuit Judge, dissenting:

I dissent from the majority opinion and would reverse the judgment of the district court which enforced a claim of general average contribution in favor of the shipowner against the United States.

The Government makes two principal contentions in this case. First, the mechanical breakdown of the ATLANTIC HERITAGE in calm seas, in mid-ocean, raises a presumption that the ship was unseaworthy when it left port. ARCO produced no evidence to rebut this presumption. Second, ARCO did not, and could not, carry its burden of proving that it exercised due diligence to make the ATLANTIC HERITAGE seaworthy. In such circumstances, ARCO would be liable under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1303(1)(a) & 1304(1), for any damage to the cargo arising from the unseaworthiness of the vessel; therefore, under the parties' contract of carriage and addenda thereto ARCO may not recover in general average.[1] I agree with the Government's contentions.

When a vessel founders or when its machinery fails on an otherwise uneventful voyage and no circumstances such as grounding, collision, or bad weather can explain such failure, a presumption arises that the vessel was unseaworthy at the beginning of the voyage. *Ionian Steamship Co. v. United Distillery*, 236 F.2d 78, 80 (5th Cir. 1956).[2] *See South, Inc. v. Moran Tow-*

4. The district court held alternatively (1) that ARCO exercised due diligence to detect any unseaworthiness prior to sailing and (2) that "even if the vessel had been unseaworthy at the beginning of the voyage, such fact was unknown and could not have been discovered through the exercise of due diligence by the master and crew." The Government suggests that it was erroneously assigned the burden of proof on these issues. ARCO's counsel reply that they conceded to the district court that ARCO had the burden on this issue. Finding no proof that the ATLANTIC HERITAGE was unseaworthy on departure ends the need to resolve this issue or to decide, if the burden was properly placed, whether either of the findings was clearly erroneous.

1. ARCO and the United States incorporated the York-Antwerp Rules, 1950, a "Jason Clause," and the provisions of COGSA into their Charter Party. The parties agree that these provisions establish ARCO's right to recover in general average only if ARCO would not be liable to the Government under COGSA in a cargo damage case. *See Orient Mid-East Lines, Inc. v. A Shipment of Rice*, 496 F.2d 1032, 1041 n.17 (5th Cir. 1974), *cert. denied*, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975).

Section 1303 of COGSA provides in pertinent part:

(1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

(a) Make the ship seaworthy.

Section 1304(1) states:

(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

2. The majority cites *Ionian Steamship's* statement that the presumption arises when the machinery "fail[s] shortly after the beginning of the voyage," 236 F.2d at 80, and finds that

*ing*, 360 F.2d 1002, 1005 (2d Cir. 1966); *Reisman v. New Hampshire Fire Ins. Co.*, 312 F.2d 17, 20 (5th Cir. 1963); *Societa Anonima Cantiero Olivo v. Federal Ins. Co.*, 62 F.2d 769, 771 (2d Cir.), *cert. denied*, 289 U.S. 759, 53 S.Ct. 792, 77 L.Ed. 1503 (1933); *Eastern Marine & Fire Ins. Co. v. S.S. CO-LUMBIA*, 411 F.Supp. 926, 928 (S.D.N.Y.), *aff'd*, 551 F.2d 299 (2d Cir. 1976); *Texaco, Inc. v. Universal Marine, Inc.*, 400 F.Supp. 311, 320 (E.D.La.1975). Such an occurrence took place here; the ATLANTIC HERITAGE lost a propeller blade in clear, calm weather, in mid-ocean, without accident or grounding.

The facts in the instant case argue more strongly for disallowing general average contribution than those presented in *Societa Anonima Cantiero Olivo v. Federal Ins. Co.*, *supra*. There, the vessel's tail shaft broke for completely unknown reasons during a gale. Judge Learned Hand affirmed the denial of general average, concluding that "the failure of so vital a part of [the ship's] machinery in weather which it should withstand, if staunch, is all that the cargo is called upon to prove. Thereafter [the ship] must prove her general fitness, and will fail upon the issue, if the evidence is in balance." 62 F.2d at 771.

Here, the evidence favors the Government. During a maneuver in the turning basin at Corpus Christi, Texas, on March 7–8, the Watch Engineer felt and reported a jolt which the Chief Engineer ultimately noted for emphasis in red ink in the smooth engine log in these words: "FELT JOLT PORT SIDE OF ENGINE ROOM, @ 0120." [3] After the propeller damage on March 25, marine surveyors made their reports to the ATLANTIC HERITAGE's insurers: "During shifting a heavy bump was heard along the port side at the stern. Owners [i. e. ARCO] contend that aforenoted occurrence at Corpus Christi was primary cause of damage." ARCO is in the anomalous position in its general average suit of denying its own contention made in its claim against its insurers.

The majority avoids this anomaly first by finding that government counsel did not adequately raise the issue of presumption of unseaworthiness before the district judge. I disagree. The opening statement, quoted by the majority, could have been clearer, but I find it sufficient to apprise the district court of the presumption of unseaworthiness upon a showing of mechanical failure in calm seas. Moreover, the district court's failure to shift the burden to ARCO to prove seaworthiness after such a showing is an error of law. In its Proposed Conclusions of Law, the Government cited Judge Hand's opinion in *Cantiero Olivo*. The district court's opinion, however, made no reference to the holding in *Cantiero Olivo*.

Next, the majority concludes that an "uneventful" two-week interval between the start of the voyage and the accident makes it "mechanically unreasonable to assume something was wrong with the ATLANTIC HERITAGE when she left port." *Supra* at 762. Again, I disagree. It is completely reasonable to assume that the jolt to the vessel during the turning maneuver at Corpus Christi, which ARCO contended was the primary cause of the ultimate damage in its claim against its insurers, cracked the blade which ultimately sheared off, and bent the other two blades. Uneventful steaming with a cracked blade and two bent blades is more reasonable than ARCO's total failure to explain the accident. I would conclude that the shearing off of the propeller blade in calm weather created a presumption that the jolt in the turning basin damaged the blades and that the vessel was unseaworthy from the start of the voyage.

two weeks is not a sufficiently short period of time. To the contrary, two weeks of continual steaming, without even a plausible intervening cause, is not too long. *See Eastern Marine & Fire Ins. Co. v. S.S. COLUMBIA*, 411 F.Supp. 926, 928 (S.D.N.Y.), *aff'd*, 551 F.2d 299 (2d Cir. 1976) (rudder falling off in a monsoon two weeks after setting sail still compels conclusion that ship was unseaworthy).

**3.** In the two months between March 3, 1973 and May 2, 1973, the jolt was the *only* occurrence noted in red in the smooth engine log. The only other highlighted event was the actual loss of the propeller blade on March 25, and that incident was merely noted in the usual blue ink and underlined in red.

Since ARCO provided no alternative explanation for the accident to rebut the unseaworthiness presumption, it must show that the exercise of due diligence would not have discovered the unseaworthy condition in order to recover under the general average clause. In a footnote, the majority declines to reach this issue since they find that the ATLANTIC HERITAGE was seaworthy. *Supra* at 763 n.4. On the contrary, I believe that the facts establish a lack of diligence on the part of ARCO.

The captain of the ship, Captain Linton, testified that he would expect the Chief Engineer to report to him any log entries made in red. However, the Chief Engineer did not do so and, though available, was not called as a witness at trial to explain this failure.[4] It is highly significant that Captain Linton further testified that if he had been aware of the log book entry, he would have ordered an immediate survey. Divers are routinely used to check a ship's stern frame, rudder and propeller for damage. Such a task could easily have been performed in this case since the ship was only partially loaded and the propeller blade tips were only three feet below the surface. The survey could have discovered the bent blades, and may have discovered the crack. Under these circumstances, ARCO has not proved that it exercised due diligence to discover the unseaworthy condition.

Thus the judgment for ARCO was erroneously entered and should be reversed.

---

4. At oral argument, counsel for ARCO explained that he did not call the Chief Engineer as a witness because, after talking with the Engineer by telephone, he found that the Engineer's recollection was "very vague" and that he "didn't have anything to contribute other than what the log actually said."