ROYAL INSURANCE COMPANY
OF AMERICA, Plaintiff,

v.

CINERARIA SHIPPING COMPANY,
Defendant.

No. 92–1694–CIV–T–24(C).

United States District Court,
M.D. Florida,
Tampa Division.

July 24, 1995.

**1558**

Kenneth E. Cohen, Kroll & Tract, Miami, FL, James W. Carbin, Kroll & Tract, New York City, for Royal Ins. Co.

Allen K. Von Spiegelfeld, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, FL, for Cineraria Shipping.

## ORDER

BUCKLEW, District Judge.

Before the Court are the parties' cross motions for summary judgment (D–37 & D–40). This Court considers these *motions* upon the parties' joint stipulation (D–31) to resolve this matter by summary judgment based upon submitted stipulations and briefs.

## FACTS

On October 24, 1986, the M/V KALLIOPI II came into the Tampa Bay port under pilotage to load a shipment of scrap iron cargo bound for Korea (D–36, Stipulation ["Stip."] 1).[1] The loading of the cargo was completed on October 29, 1986, and shortly thereafter, the crew prepared the vessel for sailing (D–36, Stip. 3, 4). The crew's preparation included testing all of the vessel's navigational equipment including the steering gear, radar and other items (D–36, Stip. 4).

Captain George McDonald, a Tampa Bay pilot, boarded the vessel at approximately 2125 hours and instructed the crew to secure the Tug ORANGE on the port bow and the Tug TAMPA on the port quarter. The crew complied with Captain McDonald's instructions (D–36, Stip. 5). At 2140 hours, the engines of the M/V KALLIOPI II were tested and placed on standby (D–36, Stip. 6). Shortly thereafter at 2145 hours, the vessel dropped her lines, and the two tugs backed the vessel out of her slip, berth 223, into Cut D Channel, which runs perpendicular to the berth (D–36, Stip. 6, 7).[2] Not using the ship's engines until 2159 hours in an attempt to line the vessel up with the channel, the Captain ordered "slow ahead" and then ordered the helm "hard to starboard" (D–36, Stip. 9). Until this point, all movement of the vessel was controlled by the Tug TAMPA and the Tug ORANGE (D–36, Stip. 9).

Upon hearing the "hard to starboard" order, the master noticed that the rudder angle indicator did not match the helm order. He thus switched the steering gear motors on

---

1. The scrap metal was transported pursuant to a "clean received onboard" Bill of Lading No. 1–S–968–LCM0601–608FU20113 signed by the master and issued at Tampa, Florida, on October 29, 1986 (D–36, Stip. 17). The Bill of Lading provided in relevant part that: (i) freight; (ii) discharging rate; (iii) as well as "all other terms, conditions and exceptions as per charter party dated 10/10/86" (D–36, Stip. 18). The charter party referenced in the Bill of Lading was Uniform Charter Party dated October 10, 1986. The charter was between Townsville Shipping Inc. of Barbados, as disponet owner of the KALLIOPI

II, and Commercial Metals Company, as charterer of the vessel for transportation of its cargo from Tampa, Florida, to Pohang, South Korea (D–36, Stip. 19).

2. Notably, the M/V KALLIOPI II was docked "bow in" while in berth 223 (D–36, Stip. 7). Captain McDonald intended to back the M/V KALLIOPI II out far enough so that he could swing the bow to starboard bringing the vessel into line with the Cut D channel in order to proceed down Tampa Bay (D–36, Stip. 8).

bridge and thereafter observed problems in getting the helm orders to synchronize with the rudder indicator. Upon investigation by the chief engineer and second officer, it was discovered that the steering gear machinery was damaged (D–36, Stip. 10). It was further determined that the rudder damage was apparently caused by the pilot backing the vessel too far and striking the western bank of Channel D with the rudder (D–36, Stip. 11). Upon the master's determination that the M/V KALLIOPI II could not proceed on her own, the vessel was returned to berth 223 with tug assistance for further inspection (D–36, Stip. 12). At that point, it was determined that disabling damage to the rudder stock occurred (D–36, Stip. 12).

Throughout this entire incident, the vessel remained within the Tampa port with tug services readily available (D–36, Stip. 13). The damage did not affect the hull of the vessel, and there was no danger of entry of seawater into the vessel as a consequence of the incident (D–36, Stip. 11). No distress calls were made by the vessel during the incident (D–36, Stip. 13). Seas were calm with winds of Beaufort force 3 at departure and diminishing to force 1 upon the vessel's return to berth (D–36, Stip. 14).

Once it was determined that the rudder was disabled and the vessel could not continue its voyage, the shipowners declared general average (D–36, Stip. 15). Following the declaration of general average, it was determined that the M/V KALLIOPI II could not be repaired with all of the cargo onboard (D–36, Stip. 21). A portion of the cargo was therefore discharged, placed on the dock, and then reloaded after the repairs were completed (D–36, Stip. 21). The repairs were performed at Tampa shipyard, and thereafter the cargo was reloaded, and the vessel completed its voyage delivering the cargo to its destination (D–36, Stip. 21).

Due to the general average declaration, all of the cargo interests were required to post security for the general average claim (D–36, Stip. 16). A general average statement was thus prepared setting forth both the general average and particular average items (D–36, Stip. 22). The statement calculates that the Plaintiff's contribution to general average would be $108,744.02 (D–36, Stip. 23). Royal Insurance Company ["Royal"], as insurer of the cargo,[3] posted the requisite security, but contends that this is not a general average act and thus, contribution is not due on their part.

Plaintiff Royal now seeks a declaratory judgment requesting the Court find that: 1) the October 29, 1986 incident was not a proper general average event; 2) Defendant had no right to declare general average and seek contribution from cargo interests; 3) Defendant's claim for contribution in general average is denied; 4) the general average guarantee issued in response to Defendant's demand is released; 5) denying Defendant's counterclaim for contribution in *toto*; and 6) granting Plaintiff such other, further, and/or different relief as this Court deems proper. In opposition, the Defendant seeks summary judgment in favor of its counterclaim for general average contribution in the amount of $108,744.02, as well as interest and costs from the time of the general average adjustment.

Based on the foregoing, the Court has before it two issues for consideration: 1) whether these facts establish a general average event; and 2) whether Plaintiff is required to contribute to general average under the provisions of the charter party.

### GENERAL AVERAGE ACT

■ General average is an equitable doctrine that is applicable "when, and only when, any extraordinary sacrifice or expenditure is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure." *Deutsche Shell Tanker Gesellschaft v. Placid Refining Co.*, 993 F.2d 466, 469 (5th Cir.1993) (quoting York/Antwerp Rule A (1974)). In such circumstances, "the party suffering the loss has a right ... to claim contribution

---

**3.** Commercial Metals Company ["Commercial"] was the owner of the cargo; thus, the Plaintiff initiated this action on behalf of Commercial.

from all who participate in the venture," including the cargo interests. *Ceramic Corp. of Am. v. Inka Maritime Corp.*, 1 F.3d 947, 948 (9th Cir.1993) (quoting Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 16–1, at 522–23 (1987)).

■ A claim for general average requires a three prong analysis. *Deutsche Shell*, 993 F.2d at 468. First, the vessel owner must establish that a general average act occurred and that there was a separate cargo owner at the time of the act. *Id.* If the vessel owner meets this first requirement, the cargo owner may avoid liability by proving that the vessel was unseaworthy at the start of the voyage, and the unseaworthiness was the proximate cause of the general average act. *Id.* Lastly, if the cargo owner establishes unseaworthiness, the vessel owner may still succeed if it proves that it exercised "due diligence" to make the vessel seaworthy at the commencement of the voyage. *Id.*

■ In determining whether a general average act occurred, the York/Antwerp Rules, 1974,[4] provide some guidance in this area of maritime law. Specifically, Rules X and XI are relevant in determining whether general average contribution is warranted.[5] Rule X provides in relevant part:

(a) When a ship shall have entered a port or place of refuge, or shall have returned to her port or place of loading in consequence of accident, sacrifice or other extraordinary circumstances, which render that necessary for the common safety, the expenses of entering such port or place

shall be admitted as general average; and when she shall have sailed thence with her original cargo, or a part of it, the corresponding expenses of leaving such port or place consequent upon such entry or return shall likewise be admitted as general average....

*See* Richard Lowndes & George R. Rudolf, *The Laws of General Average and the York–Antwerp Rules,* ¶ 676 at 319 (10th ed. J. Donaldson, C. Staughton, D. Wilson 1975) (Vol. 7 of British Shipping Laws).

(b) The cost of handling onboard or discharging cargo, fuels or stores whether at a port or place of loading, call or refuge, shall be admitted as general average, when the handling or discharge was necessary for the common safety or to enable damage to the ship caused by sacrifice or accident to be repaired, if the repairs were necessary for the safe prosecution of the voyage, except in cases where the damage to the ship is discovered at a port or place of loading or call without any accident or other extraordinary circumstances connected with such damage having taken place during the voyage....

*See* Lowndes & Rudolf, *supra* ¶ 689, at 328.

Rule XI(b) provides in relevant part:

(b) When a ship shall have entered or been detained in any port or place in consequence of accident, sacrifice or other extraordinary circumstances which render that necessary for the common safety, or to enable damage to the ship caused by sacrifice or accident to be repaired, if the

4. The York/Antwerp Rules were created in 1890 and last amended in 1974, as rules of guidance promulgated for the maritime world to address general principles, as well as special problems, in admiralty. These Rules are not binding law, but are generally incorporated into bills of lading, thus becoming part of the binding contract between the parties. Grant Gilmore & Charles L. Black, *The Law of Admiralty* § 5–5 at 252–53 (2d ed. 1981). Similarly, the charter in the instant case incorporates the York/Antwerp Rules of 1974 into the parties' agreement. Paragraph 12 of the charter specifically provides for, "[g]eneral average to be settled according to York-Antwerp Rules, 1974, proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see clause 2)." (D–39, Ex. 2).

5. The Court notes that under the York/Antwerp Rules, 1974, the Rule of Interpretation states, "[e]xcept as provided by the numbered Rules, General Average shall be adjusted according to the lettered Rules." Based on this Rule, the lettered rules are intended to provide guidance only where the numbered rules do not apply. Thus, if the facts support a claim for general average under the numbered rules, it does not matter that such facts do not satisfy a general average act under Rule A. *Eagle Terminal Tankers, Inc. v. Insurance Co. of U.S.S.R., Ltd.*, 637 F.2d 890, 894 (2d Cir.1981) (citing Richard Lowndes & George R. Rudolf, *The Laws of General Average and the York–Antwerp Rules*, ¶ 548 at 256 (10th ed. J. Donaldson, C. Staughton, D. Wilson 1975) (Vol. 7 of British Shipping Laws)).

repairs were necessary for the safe prosecution of the voyage, the wages and maintenance of the master, officers and crew reasonably incurred during the extra period of detention in such port or place until the ship shall or should have been made ready to proceed upon her voyage, shall be admitted in general average. . . .

*See* Lowndes & Rudolf, *supra* ¶ 730, at 347.

Historically, courts throughout the jurisdictions have typically found that general average acts existed in situations involving "**imminent** peril." *See Barnard v. Adams,* 51 U.S. (10 How.) 270, 303, 13 L.Ed. 417 (1850); *The Star of Hope,* 76 U.S. (9 Wall.) 203, 19 L.Ed. 638 (1869); *Hobson v. Lord,* 92 U.S. 397, 23 L.Ed. 613 (1876); *Aktieselskabet Cuzco v. The Sucarseco,* 294 U.S. 394, 401, 55 S.Ct. 467, 470, 79 L.Ed. 942 (1935). In more recent times, however, courts have varied slightly as to requisite degree of "peril" necessary to render sacrifice or extraordinary expenses recoverable under general average. Some courts have adhered to the stricter, more traditional, interpretation of "peril,"[6] while other courts have endorsed a looser interpretation of a "perilous situation."[7]

Plaintiff asserts that the instant case does not involve a general average act because the incident did not place the M/V KALLIOPI II or its cargo in "peril." In opposition, Defendant contends that the instant case qualifies as a proper general average event under the York/Antwerp Rules of 1974 and *Eagle Terminal Tankers, Inc. v. Insurance Co. of U.S.S.R., Ltd.,* 637 F.2d 890 (2d Cir.1981), because the vessel could not continue its voyage without repairs, and as such, the vessel and its cargo were in peril until such time as the repairs were made. The Defendant therefore asserts that it is entitled to general average contribution.

Plaintiff contends that *Eagle Terminal,* as relied upon by the Defendant, is an aberration and creates an "artificial general average" that allows for general average contribution without a showing of actual danger or peril (D–42, pg. 4–5; D–43, pg. 5). The Plaintiff further asserts that the Second Circuit faithfully adhered to the peril requirement until its decision in *Eagle Terminal* (D–42, pg. 4). This Court notes that such statement is inaccurate[8] and that the Plaintiff has misconstrued *Eagle Terminal*'s interpretation of "peril." The *Eagle Terminal* court specifically held that:

> It is clear that the law of general average continues to require a showing of peril. But in this century, perils less than "imminent" have been recognized as sufficient to create a general average situation.

*Id.* at 893. Moreover, the *Eagle Terminal* court further explained that under Rule XI(b) of the York/Antwerp Rules of 1974 the requirement of "peril" is not eliminated, but rather is presumed in cases where a voyage cannot continue without repairs due to accident or sacrifice. *Id.* at 896. This Court endorses the *Eagle Terminal*'s interpretation of "peril." Thus, this Court does not limit "peril" to the risk of sinking or vast destruction aboard ship, but rather finds that it is a broader term wherein the prosecution of a voyage is severely threatened.

Defendant's reliance on *Eagle Terminal* is strongly rooted in its factual similarities to the present case. In *Eagle Terminal,* the vessel while in route to Russia hit some unseen object in the water causing extensive damage to the propeller. 637 F.2d at 891. The parties decided that the vessel should continue to Rotterdam where an underwater investigation and repairs would be per-

---

**6.** *See Deutsche Shell Tanker,* 767 F.Supp. 762 (E.D.La.1991), aff'd, 993 F.2d 466 (5th Cir.1993); *Orient Mid–East Lines, Inc. v. A Shipment of Rice,* 496 F.2d 1032 (5th Cir.1974).

**7.** *See Eagle Terminal,* 637 F.2d 890 (2d Cir. 1981); *Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc.,* 92 F.2d 41 (2d. Cir.), cert. denied, 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937).

**8.** Before the court's opinion in *Eagle Terminal,* the Second Circuit Court of Appeals in *Naviga-*

*zione,* 92 F.2d 41, 43 (2d. Cir.1937), also applied a broader interpretation of "peril" stating that contribution in general average requires an element of peril, however:

> [T]he 'imminency' of the peril is not the critical test. If the danger be real and substantial, a sacrifice or expenditure made in good faith for the common interest is justified, even though the advent of any catastrophe may be distant or indeed unlikely.

formed. *Id.* The underwater investigation revealed that the vessel was unable to complete its intended voyage in its current state. *Id.* Thus, a portion of cargo was unloaded, the ship dry docked, the propeller repaired, and cargo re-loaded. *Id.* The ship then continued on to its destination, and the cargo was discharged. *Id.* The shipowner sued for general average contribution for the expenses incurred from the vessel's damage. *Id.*

The trial court denied recovery finding that the "peril" required by the traditional principles of general average and the York/Antwerp Rules was not present. *Id.* On appeal, the Second Circuit Court of Appeals reversed the lower court decision. *Id.* at 898. Following a thorough review of the law of general average and the York/Antwerp Rules, the Second Circuit found that Rules X and XI applied to the case, and thus, the ship's repairs were general average acts because they were necessary for the "safe prosecution of the voyage." *Id.* at 897. Relying heavily on the "safe prosecution clause"[9] of Rule XI(b) and the Rule of Interpretation, the court explained, "repairs necessary for the safe continuation of the voyage can be deemed general average acts, even if they would not be so regarded under Rule A alone." *Id.* at 896. The court further commented that under the York/Antwerp Rules, peril need not be imminent, but merely anticipated, as long as peril does exist. *Id.* (citing Leslie J. Buglass, *Marine Insurance and General Average in the United States*, 122, 123–24 (1973)). Moreover, the court found that the vessel's damage created a "real and substantial" danger of loss or complete incapacitation of the propeller and consequent peril if the ship remained at sea or returned to sea without repairs. *Id.* at 897. The court therefore concluded that the shipowner established a prima facie case for general average contribution under Rules X(b) and XI(b). *Id.*

As in *Eagle Terminal*, the M/V KALLIOPI II had left her place of loading and thereafter had an accident. As a consequence, she had to enter a "port or place of refuge," specifically she had to return to her place of loading due to the rudder damage. If M/V KALLIOPI II's steering mechanism had not been repaired, it is highly improbable that the ship would have been able to safely complete its voyage. It seems self-evident to this Court that the M/V KALLIOPI II could not proceed without steering gear, and repairs to a part of a ship as significant as the rudder must be made for the common safety of the ship and cargo. The vessel's perilous situation was further demonstrated by the ship's request for tug assistance to return to the berth. If M/V KALLIOPI II had continued its voyage without the needed repairs, it is highly probable that immediate peril would have followed, or at least a "real and substantial" danger of loss. As in *Eagle Terminal*, this Court finds Rules X and XI of the York/Antwerp Rules, 1974, are applicable to the instant case wherein the M/V KALLIOPI II may not have been in "imminent" peril, but she could not complete the "safe prosecution" of her voyage if she had not returned to port for repairs.

The Fifth Circuit Court of Appeals took a different view of Rules X(b) and XI(b) than the Second Circuit in *Orient Mid–East Lines, Inc. v. A Shipment of Rice*, 496 F.2d 1032, 1039 (5th Cir.1974), *cert. denied*, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975), where the court denied general average contribution of the shipowner finding that the ship was never in "peril." In that case, the ship was intentionally anchored at sea to complete some repair work on its port boiler. *Id.* at 1036. Due to the soft silt at the point of anchorage, the repairs could not be completed, and it was decided that the ship should be towed back to berth. *Id.* With difficulty the vessel was removed from

---

**9.** The Safe Prosecution Clause of Rule XI(b) provides:

> [T]o enable damage to the ship caused by sacrifice or accident to be repaired, if the repairs were necessary **for the safe prosecution of the voyage,** the wages and maintenance of the master, officers and crew reasonably in-

curred during the extra period of detention in such port or place until the ship shall or should have been made ready to proceed upon her voyage, shall be admitted in general average....

(Emphasis added).

the mud and silt, and upon breaking free, it rapidly proceeded backward across the river barely avoiding a collision with a dock on the opposite side of the river. *Id.* Thereafter, the ship proceeded across the channel and once again was grounded. *Id.* Later in the voyage, further damage occurred to the propulsion system. *Id.* at 1037. The shipowner thus brought a claim for general average for the expenses incurred in the voyage from the combined incidents. *Id.*

The court in *Orient Mid–East* explained that Rules X and XI concern expenses incurred at a port of refuge and are limited to actions taken "for the common safety." *Id.* at 1039. The *Eagle Terminal* court disagreed with *Orient Mid–East* court's limitation of Rules X and XI to actions taken solely "for the common safety," noting that the *Orient Mid–East* court was ignoring recovery under the safe prosecution clause of Rule XI. *Eagle Terminal,* 637 F.2d at 897. The *Orient Mid–East* court further noted as explained by the district court that the requisite peril was not present where the ship was intentionally and safely anchored in the soft silt; the vessel was not in danger of colliding with another ship, and it was not causing any interference with navigation. 496 F.2d at 1039.

Unlike *Orient Mid–East,* where the requisite peril was not present for general average contribution, the instant case demonstrates a perilous situation warranting general average. If the M/V KALLIOPI II only had to be pulled from a soft silt grounding where it had been intentionally and safely anchored as in *Orient Mid–East,* the Court would follow the *Orient Mid–East* ruling and deny general average. However, the instant case is distinguishable from *Orient Mid–East.* Notably, the M/V KALLIOPI II was in navigation at the time of the accident and was not in a safe anchorage as the vessel was in *Orient Mid–East.* Because of the location of the accident in the present case, the M/V KALLIOPI II would have been a hazard to navigation if she proceeded with a damaged

rudder unlike the situation in *Orient Mid–East.*

Moreover, in *Orient Mid–East* the court explained, in part, that Rules X and XI were not applicable because such rules "concern expenses incurred at a port of refuge entered as a general average act." *Orient Mid–East,* 496 F.2d at 1039. In *Orient Mid–East,* the initial damage caused by grounding the ship did not require her to return to a port or place of refuge for repairs as required under Rules X and XI of the York/Antwerp Rules, 1974.[10] In contrast however, the M/V KALLIOPI II had to return to her port as a "consequence of accident, sacrifice or other extraordinary circumstances" necessary for the common safety and to "enable damage to the ship caused by sacrifice or accident to be repaired." *See* Rule X(a), Lowndes & Rudolf, *supra* ¶ 676, at 319; Rule XI(b), Lowndes & Rudolf, *supra* ¶ 730, at 347. The Court therefore finds that Rules X and XI are applicable to the instant case, and thus, the broader interpretation of "peril" under the Rules is appropriate.

In addition to the *Orient Mid–East* court's denial of general average contribution due to the inapplicability of the York/Antwerp Rules, the court primarily denied contribution due to the shipowner's lack of due diligence in making the vessel seaworthy. 496 F.2d at 1038. Similarly, in *Deutsche Shell,* 993 F.2d 466, 469 (5th Cir.1993), the court denied general average contribution due to the shipowner's failure to exercise due diligence in maintaining the seaworthiness of the ship. In *Deutsche Shell,* a crude oil tanker ran aground in the Mississippi River, and thereafter the shipowner declared general average for the cost of degrounding the tanker. *Id.* at 468. Based solely on the vessel's unseaworthy condition, the Fifth Circuit upheld the district court's decision precluding general average and further commented that, "we need not decide whether the vessel was in peril nor whether the issue was raised properly."[11] *Id.* at 469.

---

**10.** The ship did however have to return to a port for repairs to the high pressure turbine. However, general average for this incident was denied based on the unseaworthiness of the ship. *Orient Mid–East,* 496 F.2d at 1039–40.

**11.** The Court notes however that the district court in *Deutsche Shell* did address the "peril" issue finding that the cost of degrounding the oil tanker did not constitute a general average event because the ship did not sustain severe damage

In the instant case, there are no allegations of unseaworthiness. Because the *Deutsche Shell* court denied general average due to the unseaworthiness of the vessel, the Court does not find *Deutsche Shell* to be persuasive or applicable to the instant case. Moreover, it is important to note that there was no assertion in *Deutsche Shell* that Rule X or XI of the York/Antwerp Rules, 1974, applied to the case. The damage that occurred in *Deutsche Shell* did not require the vessel to return to a "port or place of refuge" as a consequence of the accident. The Court therefore finds that *Deutsche Shell* is not analogous to the instant case.

Based on the foregoing analysis, this Court adopts the court's reasoning in *Eagle Terminal* as well as its endorsement of Rules X and XI of the York/Antwerp Rules, 1974, and thus finds that the M/V KALLIOPI II's accident created a situation of "peril" such that the voyage could not be continued until necessary repairs were made. The Court therefore finds that a general average event occurred in the present case.

### GENERAL AVERAGE UNDER THE CHARTER PARTY

Having found that the M/V KALLIOPI II was involved in a general average act, the Court now addresses whether the Defendant has a contractual right to general average under the charter party (D–39, Ex. 2). This issue arises out of the alleged conflict between Paragraph twelve (12) of the charter party, the New Jason Clause,[12] and Paragraph fifty-one (51) of the rider to the charter party. Defendant asserts that it is entitled to contribution based on the following provisions of the charter party:

> [¶ 12] General average to be settled according to York–Antwerp rules, 1974. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or

default of the Owner's servants (see clause 2).

(D–39, Ex. 2).

*New Jason Clause*

> In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimate contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the Carrier before delivery.

(D–36, Stip. 20; D–39, Ex. 2).

In opposition, Plaintiff asserts that the following provision (¶ 51) of the rider to the charter party relieves it from any liability due to the pilot's negligence:

> [¶ 51] The pilot, Master, officers, crew of the vessel and any towboat person or facility assisting the vessel excluding Charterers, Shippers or Receivers personnel or their servants shall not be agents or employees of the Charterers and Charterers shall not be liable for any loss damage or claims resulting from or arising out of negligence or error of any of them while vessel is proceeding to or lying at any place of loading and/or discharging.

(D–36, Stip. 19; D–39, Ex. 2).

■ The Court notes that the New Jason Clause and Paragraph 12 speak directly to

---

nor was there an imminent or significant threat of an oil spill into the river. *Deutsche Shell,* 767 F.Supp. 762, 784 (E.D.La.1991).

**12.** Paragraph 40 of the charter party contained a provision incorporating the "New Jason Clause" into the charter party (D–39, Ex. 2).

the issue of general average. As such, this Court finds that these provisions are controlling as to general average contribution. While Paragraph 51 and Paragraph 12, in combination with the New Jason Clause, may appear to be contradictory, the Court finds that they can be reconciled. The Court interprets Paragraph 51 as precluding the Defendant from bringing an independent lawsuit for damages against the Charterers caused in this case by the pilot's negligence. In the instant case, however, the Defendant is not suing the Charterer for the entire amount of damages due to the pilot's fault, but rather is asking for an equitable sharing of the accident's expenses.

 A New Jason Clause is enforceable and provides for general average contribution even where the carrier is negligent, unless the carrier is responsible for damage under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300–1315. *See Deutsche Shell*, 993 F.2d at 468; *Louis Dreyfus Corp. v. 27,946 Long Tons of Corn*, 830 F.2d 1321, 1330 (5th Cir.1987); *Atlantic Richfield Co. v. United States*, 640 F.2d 759, 761 (5th Cir.1981). COGSA holds a carrier (or ship) at fault for damage to the cargo caused by unseaworthiness as a result of "want of due diligence on the part of the carrier to make the ship seaworthy." 46 U.S.C. § 1304; *Deutsche Shell*, 993 F.2d at 468; *Atlantic Richfield*, 640 F.2d at 761.

In the present case, there is no assertion of the vessel's unseaworthiness. Moreover, the stipulated facts indicate to the contrary. Specifically, the parties agree that shortly before the beginning of M/V KALLIOPI II's voyage, "the crew tested all of the vessel's navigational equipment including the steering gear, radar and other items" (D–36, Stip. 4). With no allegations of the carrier's failure to exercise due diligence to make the vessel seaworthy, the Court finds that the Defendant is not precluded by COGSA from general average contributions under the New Jason Clause. Having found no limitation under COGSA for general average, the Court finds that the Defendant is entitled to general average contribution under Paragraph 12 and the New Jason Clause, even in light of the pilot's negligent acts.

Accordingly, it is **ORDERED and ADJUDGED** that:

1) The Plaintiff's Motion for Summary Judgment (D–37) is DENIED.

2) The Defendant's Motion for Summary Judgment (D–40) is GRANTED.

3) The Plaintiff shall contribute to general average in the amount of $108,744.02, plus interest and costs from the time of the general average adjustment.

4) The Clerk is directed to CLOSE this case.

DONE AND ORDERED.