SEALIFT BULKERS, INC., Plaintiff,

v.

REPUBLIC OF ARMENIA, Defendant.

Civil Action No. 95–1293 (PLF).

United States District Court,
District of Columbia.

March 30, 2000.

Nicholas H. Cobbs, Washington, DC, for Plaintiff.

Cherie B. Artz, Schnader Harrison Segal & Lewis, Washington, DC, for Defendant.

## MEMORANDUM OPINION

PAUL L. FRIEDMAN, District Judge.

This matter arises from a charter agreement between plaintiff, Sealift Bulkers, Inc., and defendant, the Republic of Armenia, to transport wheat to Armenia during a time of famine. Plaintiff brought this lawsuit to recover the money it spent to warehouse the wheat on another ship when it was delayed in port by civil unrest in the Republic of Georgia. Plaintiff claims that defendant is responsible for reimbursing it under the charter because the expenses were "special charges"—expenses incurred "for the safety and preservation of the cargo." Because the Court finds that the transfer of the wheat to another ship did nothing to further the "safety and preservation of the cargo," it concludes that defendant has no obligation under the agreement between the parties to reimburse plaintiff's expenses and will grant summary judgment in favor of defendant.[1]

## I. BACKGROUND

In 1993, the United States Commodity Credit Corporation ("CCC") donated a gift

---

1. By Opinion and Order of November 22, 1996, the Court granted the motion of the United States to dismiss it as a party defendant on grounds of sovereign immunity. *See Sealift Bulkers, Inc. v. Republic of Armenia,* 1996 WL 901091 (D.D.C. Nov.22, 1996). By Opinion and Order of May 30, 1997, the Court granted plaintiff's motion for the entry of default judgment against defendant Republic of Armenia because the Republic of Armenia failed to enter an appearance after having been properly served under the Foreign Sovereign Immunities Act. *See Sealift Bulkers, Inc. v. Republic of Armenia,* 965 F.Supp. 81 (D.D.C.1997). By Memorandum Opinion and Order of October 14, 1998, the Court granted the Republic of Armenia's motion to vacate the default judgment, reopened the case and restored it to the Court's calender. *See Sealift Bulkers, Inc. v. Republic of Armenia,* Memorandum Opinion and Order of October 14, 1998.

of wheat to the Republic of Armenia pursuant to the Agriculture Act of 1949. The CCC and the Republic of Armenia entered into an agreement to implement the donation of wheat. Under the Donation Agreement, Armenia agreed, in exchange for the gift, to arrange ocean transportation for the wheat and to arrange and pay for transportation, handling, storage, and distribution within the Republic of Armenia.

Pursuant to its obligations under the Donation Agreement, the Republic of Armenia entered into a separate Charter Party Agreement (the "charter" or the "agreement") with its chosen carrier, Sealift Bulkers, Inc. on the basis of "full berth terms." Two portions of this agreement are particularly relevant. First, paragraph 10 of the agreement states:

> The cargo is to be discharged at Vessel's time, risk, and expense with no demurrage, no despatch, and no detention. Contractor to deliver cargo in rail cars through Bill(s) of Lading to final destination (Airum, Armenia) at Owner's time, risk and expense. The Government of Armenia, as the Receiver of this cargo, will take delivery in rail cars at this point of entry and will transport the rail cars at their expense to destinations within Armenia.

Government of Armenia Charter Party Agreement, Pl.'s Motion for Summ. J., Exh. 4 ¶ 10. "Vessel" is defined in the agreement as the Inger, plaintiff's ship that transported the cargo. *Id.* at Preamble. "Owner" is defined at Sealift Bulkers, Inc. *Id.*

Second, paragraph 29 of the agreement states:

> In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to

negligence or not, for which, or for the consequences of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, Receivers or owners of the goods shall contribute with the carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred with respect to the goods.

*Id.* ¶ 29.[2]

During the summer of 1993, Sealift loaded the wheat onto the Inger, which carried the wheat from the United States to the port of Poti, Georgia. The Inger arrived in Poti on August 31, 1993. Finding that civil unrest had erupted in the Republic of Georgia and that the rail service between Poti and Armenia had been interrupted, the Inger was not able to locate railcars on which to offload the wheat. Sealift therefore requested an alternative point of discharge. Armenia refused the request, insisting that the Inger deliver the wheat to Airum, Armenia via the ports of Poti or Batumi as the charter instructed.

The Inger next contacted the port of Batumi, Georgia, which, while also congested, was active. The Inger attempted to "jump the line" at Batumi by offering to pay other vessels to exchange places in the queue for docking, but no other vessels accepted the offer. Eventually, Sealift chartered a second vessel at Poti, the Catherine L., onto which it completely unloaded the wheat by September 20, 1993.[3] The Inger then returned to the United States to perform unrelated work. The rail lines from Armenia to Georgia reopened and the wheat was discharged from the Catherine L. onto rail cars between September 26, 1993 and October 23, 1993. While some of the wheat was diverted and never reached Armenia, the

---

**2.** Paragraph 29 is known as a "New Jason" clause as a result of the Supreme Court's decision that this type of clause is valid in *The Jason*, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912).

**3.** By this time, the rail lines had reopened and the port at Poti was capable of allowing the Inger to dock. *See* Telefax from Pace Int'l Corp, Pl.'s Motion for Summ. J., Exh. 8 at 4(m).

remainder eventually made it to its destination.

Sealift now has filed suit to recover its expenses associated with chartering the Catherine L. Sealift claims that these expenses were "special charges" that Armenia is required to pay under paragraph 29 of the charter. In particular, Sealift requests to be reimbursed $370,501.03 for chartering the Catherine L. and $63,000 for leasing the vacuvators used to transfer the wheat from the Inger to the Catherine L.

## II. DISCUSSION

Sealift admits that it was responsible under the general terms of the charter for the expenses related to the transportation of the wheat to the Armenian border. *See* Deposition of John J. Raggio, Def.'s Motion for Summ. J., Exh 1 at 67–68; Deposition of Ragnar Meyer–Knutsen, Def.'s Motion for Summ. J., Exh. 7 at 33–36, 116–17. *See also* Government of Armenia Charter Party, Pl.'s Motion for Summ. J., Exh. 4 ¶ 10 ("Contractor to deliver cargo in rail cars through Bill(s) of Lading to final destination (Airum, Armenia) at Owner's time, risk and expense"). Sealift therefore only could recover its expenses if some provision of the charter shifted the responsibility for the cost of storing the wheat on the Catherine L. to Armenia. Sealift claims that paragraph 29 of the charter in general, and the clause stating that Armenia shall pay "special charges incurred with respect to the goods" in particular, shifted the responsibility.

The parties disagree regarding the meaning of the term "special charges." Armenia contends that "special charges" are expenses incurred in order to protect cargo from a "general average event." A general average event is an event creating a peril that threatens the entire voyage. *See* THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 351 (2d. ed.1994). Sealift, on the other hand, distinguishes "special charges" from a "general average event" or "general average loss," arguing that "special charges" are expenses incurred by the shipowner to protect the cargo from loss or destruction, while "general average charges" are expenses incurred to protect *both* the ship and the cargo. *See Orient Mid–East Lines, Inc. v. A Shipment of Rice*, 496 F.2d 1032, 1038 (5th Cir.1974) ("General average concepts apply only to action taken for the common safety when the ship and its cargo are in peril"); *Eagle Terminal Tankers, Inc. v. Insurance Co. of U.S.S.R., (Ingosstrakh), Ltd.*, 489 F.Supp. 920, 923 (S.D.N.Y.1980), *rev'd on other grounds*, 637 F.2d 890 (2d Cir.1981) (same).

Although it appears that Sealift is correct that "special charges" have a meaning apart from a "general average event," the differences between the parties' definitions does not further Sealift's argument because the Catherine L. expenses do not satisfy even Sealift's definition of "special charges."[4] While Sealift argues that "special charges" are expenses incurred by the shipowner to protect the cargo from loss or destruction, Sealift does not provide any

4. While the Court has not located any authority that specifically discusses the distinction between "special charges" and "general average event" or "general average loss," the two terms are addressed separately when they are discussed by courts and commentators and therefore appear to be separate types of expenses. Most convincingly, the "general average" portion of the "New Jason" clause is most often used without any language regarding "special charges," suggesting that "special charges" must have some additional or different meaning or the mention of them would be superfluous. *See, e.g., Usinas Siderugicas de Minas Geras v. Scindia Steam Navigation Co., Ltd.*, 118 F.3d 328, 331 n. 2 (5th Cir.1997); THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW 358 (2d. ed.1994); *see also Deutsche Shell Tanker Gesellschaft v. Placid Refining Co.*, 993 F.2d 466 (5th Cir.1993) ("The standard 'New Jason clause' requires general average contribution even if the carrier is negligent …"). The structure of the New Jason clause in the Charter Party Agreement here also suggests that the concepts are quite separate and are intended to deal with different matters. *See supra* at 2.

**4**

indication of how the transfer of the wheat from the Inger to the Catherine L. protected "the cargo from loss or destruction." Sealift has pointed the Court to a number of cases in which the threat of an ongoing war necessitated "special charges" to protect the cargo. In every case cited by Sealift, however, the action taken by the ship owner actually removed the cargo from danger, specifically the danger of confiscation. *See, e.g., The Styria v. Morgan*, 186 U.S. 1, 22 S.Ct. 731, 46 L.Ed. 1027 (1901) (captain landed and warehoused cargo rather than exposing it to danger of confiscation at sea); *The Wildwood*, 133 F.2d 765 (9th Cir.1943) (master abandoned voyage and returned cargo to shipper rather than exposing it to danger of confiscation at sea); *Nobel's Explosives Co. v. Jenkins & Co.*, 2 Q.B. 326 (Q.B.1896) (England) (captain landed and warehoused dynamite rather than expose it to danger of confiscation at sea).[5]

The facts of this case are quite different. Sealift describes the volatile situation in Poti at length, apparently arguing by implication that the cargo on the Inger was threatened by the conflict. Even assuming the danger was real, however, Sealift took no action to remove the cargo from the danger of confiscation or any other perceived danger. If the wheat on the Inger was threatened off the coast of Poti, it was equally threatened on the Catherine L. By transferring the wheat to the Catherine L., Sealift put the wheat in precisely the same situation that it had been in on the Inger—on a ship, in port. In fact, Sealift's only statement of its reasons for transferring the wheat does not reflect a need or desire to protect the cargo; rather Sealift "readily admits that it stored the cargo on the Catherine L. in order to free up the Inger for new charters." Pl.'s Motion for Summ. J. at 35. The expenses incurred by Sealift to transfer and store the wheat on the Catherine L. therefore

were not for the purposes of protecting "the cargo from loss or destruction" and thus were not "special charges" under any interpretation of that term. As no other provision of the charter shifts the responsibility to Armenia for the expenses of chartering the Catherine L. as an alternative place to store the wheat until the rail lines reopened, Sealift cannot recover those expenses. Armenia's motion for summary judgment therefore will be granted.

An Order and Judgment consistent with this Opinion is entered this same day.

SO ORDERED.

---

5. In addition, the cargo at issue in each of the cited cases had been declared contraband by a warring nation, thereby giving credence to each captain's concerns about confiscation.

Sealift has not suggested that any warring party in Georgia had declared wheat to be contraband or had threatened to confiscate it.